**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ANGELA MINK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:12-cv-00446** |
| **v.** | ) | |
| | ) | **Judge Aleta A. Trauger** |
| **PASSPORT HEALTH COMMUNICATIONS,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Defendant Passport Health Communications, Inc. ("PHC") has filed a Motion to Dismiss and/or Motion for Summary Judgment (Docket No. 21), to which the plaintiff, Angela Mink, filed a Response in opposition (Docket No. 32), and PHC filed a Reply (Docket No. 38). PHC has also filed several "Objections" related to the admissibility of certain evidence (Docket Nos. 42-49), to which Mink has filed Responses in opposition (Docket Nos. 51-58). For the reasons stated herein, PHC's Objections will be sustained in part and overruled in part, and PHC's Motion for Summary Judgment will be denied.

## BACKGROUND

### I.    Overview

PHC provides software to health care providers to improve their business operations and to secure payment for their services. To assist clients, PHC employs "trainers," who travel to client offices to train the clients on how to utilize PHC's software. Mink worked as a trainer for PHC from February 2003 through her involuntary termination on January 21, 2011. In February 2004, Tracy Shaw (a female) became Mink's direct supervisor within the Training Department.

1

Shaw was and remains openly in a same-sex relationship with a woman.

Between February 2004 and May 2005, Shaw made a number of comments to Mink that Mink found to be offensive and harassing.  For example, Shaw often asked Mink if she was "sleeping with anybody" on the road, which Mink found to be offensive and inappropriate.  Also, on five or six occasions when Mink would mention something about her own boyfriend, Shaw would tell Mink that "you need to switch sides" and/or that she should "join the other team" – meaning become a lesbian.  Shaw also told Mink five or six times that Mink "would be a great lipstick lesbian," referring to a lesbian woman who exhibits more traditional "feminine" attributes.  With respect to the "lipstick lesbian comment," Shaw would tell Mink that "I know some girls that would like you."  Shaw also told Mink that Shaw would have preferred to hire a different female trainer over Mink, because that female trainer was bisexual and prettier than Mink.  Shaw persisted in making these types of comments, even though Mink told her to "back off."

In May 2005, at least one of Shaw's subordinates, Kellie Worley, complained to management about Shaw's management style and about Shaw having engaged in same-sex harassment.  At the time, several employees (both male and female) similarly felt that Shaw frequently harassed them about their sexual orientation and/or made suggestive comments concerning their sexuality.  A new Human Resources employee, Katy Johnston, interviewed Mink and several other subordinates of Shaw's (including Missy Broadway, Linda Whetnight, Worley, and Dan Garver), all of whom made similar complaints about Shaw.  Although PHC did not formally discipline Shaw following Johnston's investigation, Johnston advised Shaw to change her conduct in several respects –  including refraining from addressing issues related to

sexual orientation with her co-workers – and required Shaw to attend monthly "coaching sessions."  Shaw was highly displeased with Johnston's handling of the investigation, which Shaw believes was "very unprofessional" in multiple respects.  Shaw also was unhappy that Johnston seemed to have assumed that the allegations against her were true, without getting Shaw's side of the story.

In 2005, Shaw told an intermediate supervisor, Garver, that she blamed Mink (apparently incorrectly) for initiating Johnston's investigation.  In 2007, Shaw moved to another position within PHC.  In 2008, Johnston left the company.

In March 2010, Shaw re-assumed a supervisory position over Mink.  With the exception of one trainer in California, Mink was the only employee left who had spoken with management in the 2005 investigation of Shaw.  Mink contends that, upon resuming her supervisory role over Mink in March 2010, Shaw sought to fire Mink in retaliation for Mink's (purported) initiation of the May 2005 investigation.  Mink contends that Shaw essentially "set up" Mink to fail by overloading her with work and unfairly disciplining and reporting Mink for trivial administrative violations.

In August 2010, David Fox, who had no knowledge of the 2005 investigation of Shaw or of Mink's participation it, became Shaw's supervisor.  In September 2010, Shaw issued a formal "Corrective Action" report to Mink, detailing several alleged performance failures by Mink.  In late 2010 and early 2011, Shaw reported to her superiors that Mink continued to make performance-related mistakes.  During that time frame, a client also complained about a training that Mink (in part) conducted, and Mink did a poor job in a mock training exercise in front of Fox and Shaw.  On January 21, 2011, with Fox's blessing, PHC terminated Mink and issued her

a final write-up that detailed certain purported performance failures, *not* including the client-related incident or the mock training exercise.

Mink contends that Shaw engineered her January 2011 termination in retaliation for Mink's participation in the May 2005 investigation, in which Mink claims she reported (and therefore) opposed same-sex harassing conduct by Shaw. Although not explicitly addressed in the briefing here, Mink essentially proceeds under a "cat's paw" theory of liability, alleging that PHC is liable for retaliation to the extent that Shaw engaged in unlawful retaliation under Title VII of the Civil Rights of 1964. *See Bishop v. Ohio Dep't of Rehabilitation & Corrections*, — F. App'x — , 2013 WL 3388481, at *10 (July 9, 2013) ("When an adverse decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability.") (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 605 n.13 (6th Cir. 2008)).

PHC has moved for summary judgment, contending that Mink has not made out a *prima facie* case and that, even if Mink has met that burden, she cannot show that PHC's proffered legitimate non-discriminatory reason for Mink's discharge (performance deficiencies) was a pretext for unlawful retaliation.[1]

---

[1] The parties have filed a substantial volume of materials with respect to PHC's motion. In support of the motion, PHC has filed a Memorandum of Law (Docket No. 22), an Appendix of Unpublished Cases (Docket No. 23), the Declaration of Tracy Shaw (Docket No. 24), the Declaration of David Fox (Docket No. 25), and a Statement of Undisputed Material Facts with attached exhibits (Docket No. 26, attaching deposition transcript excerpts) ("PHC's SUMF"). In support of its Response in opposition to PHC's motion, Mink has filed a Response to PHC's SUMF (Docket No. 33) and a Statement of Additional Material Facts (Docket No. 34) ("Mink's SUMF"), a Notice of Filing attaching unpublished cases (Docket No. 35), declarations from Mink (Docket No. 36, Ex. 1) and Tara L. Swafford (Docket No. 36, Ex. 1), and several

PHC has also moved to dismiss Mink's retaliation claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. First, this motion is procedurally improper because, by filing an Answer, PHC already waived its right to move under Rule 12(b)(6). Second, the purported 12(b)(6) arguments at times improperly rely on evidence in the record, which the court may not consider in analyzing the sufficiency of the allegations in a complaint. Third, it is well past the point at which analyzing the sufficiency of the Complaint allegations would serve any useful purpose, and PHC has not provided any justification for waiting until after the completion of discovery to challenge the Complaint for failure to state a claim. Accordingly, the court will deny the Rule 12(b)(6) motion without further discussion and will restrict its analysis to the timely and procedurally proper Motion for Summary Judgment by PHC under Rule 56. However, in a separate section herein, the court will consider PHC's argument that Mink's Response addresses a theory of liability against PHC that was not properly within the scope of the case as defined by Mink's EEOC charge and her Complaint.

## II.   Notices of Objection

In her Response in opposition to the Motion for Summary Judgment, Mink relies on various discovery materials, including her own affidavit, her deposition testimony, and testimony from multiple witnesses in the case, as well as an affidavit from her counsel, Tara Swafford. PHC argues that the court should not rely on certain passages within the Mink Affidavit, excerpted deposition transcripts, and the Swafford Affidavit, on the grounds that the passages

---

deposition transcript excerpts (Docket No. 37). In support of its Reply, PHC filed an appendix of unpublished cases (Docket No. 39), a Response attaching additional deposition transcript excerpts (Docket No. 40, Exs. A-J), the Supplemental Declaration of Tracy Shaw (Docket No. 41), and Objections to the court's consideration of certain evidence in the record, to which Mink responded.

would be inadmissible at trial on one or more grounds. Because the standard for admissibility is the same at this stage as at trial, the court will consider the objections at this stage. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (to survive a Rule 56 motion, plaintiff must "must come forward with affidavits or other admissible evidence"); *see also* Fed. R. Civ. P. 56(c)(4) (affidavits must, *inter alia*, "set out facts that would be admissible in evidence"). In ruling on the Objections at this stage, the court intends its rulings to have preclusive effect in this case. Therefore, the court expects that the parties will not file motions *in limine* that retread evidentiary objections already addressed in this opinion.

With respect to each Objection, the court hereby finds as follows:

- Objection No. 1: PHC's Objection to the Mink Declaration will be sustained in part and overruled in part. Mink testified that, in her May 2005 interview with Johnston, she told Johnston "a lot about the gay issues" with Shaw and "all the uncomfortable things that [Shaw] was doing." However, at deposition, Mink could not recall specifically what she told Johnston. The court does not construe Mink's failure to recall specifics as precluding her from arguing that, under the applicable legal standards, she engaged in protected "opposition" activity under Title VII. Thus, the court finds that the "sham affidavit" doctrine does not apply. However, the court will not accept Mink's statement that she engaged in opposition activity at face value, because it constitutes a legal conclusion. Instead, in the relevant section herein, the court will examine whether Mink's testimony is sufficient to establish at least a genuine dispute of material fact as to whether she engaged in protected activity.

- Objection No. 2: PHC's Objection to deposition testimony from Mink will be sustained in part and overruled in part. First, the court will consider the testimony concerning Whetnight only for the limited and undisputed purpose for which it was offered. Second, with respect to Mink's statement that another trainer, "Clay," was not disciplined by Shaw despite failing to timely submit eight training reports, Mink explained that she determined this fact based on email reports that both she and Clay (and the other trainers) received collectively, thereby establishing the requisite foundation for admissibility. Third, the court will sustain PHC's objection to testimony from Mink about warnings from her co-workers that, when Shaw became her supervisor, Mink should "watch her back" and/or that her "days were numbered." Whether Mink subjectively feared

retaliation upon Shaw's returning to supervise Mink in March 2010 makes it no more or less likely that Shaw actually retaliated against Mink. Thus, the evidence is not relevant, and even if Mink's state of mind were of tangential relevance, the prejudicial nature of the evidence would substantially outweigh its probative value.

- Objection No. 3: PHC's Objection to deposition testimony from Broadway will be sustained in part and overruled in part. Broadway testified that, in March 2010, shortly after Broadway left PHC and during the same time frame in which Shaw resumed her role as Mink's supervisor, Shaw called her and inquired about Mink's past work performance. Although Broadway could not recall the specific questions that Shaw posed to her, Broadway recalled getting the impression that Shaw was trying to find "reasons that I think Angela [Mink] wasn't a good trainer" and that the call seemed designed "basically to find out if I could help or support a reason to fire Angela." As a consequence, from Broadway's perspective, "it was clearly leading me to believe she [Shaw] was looking for reasons to fire Angela, but like I said, I don't remember the actual questions." This testimony is based on Broadway's personal knowledge and constitutes permissible lay opinion based on Broadway's rational inferences from her discussion with Shaw. At trial, counsel for PHC may establish that Broadway did not actually know Shaw's subjective purpose in making the call, but that does not preclude Broadway from presenting her impressions from the call.

  The court will not permit Broadway to offer her (positive) impressions of Mink's performance for any time period after which Broadway worked with Mink. Also, the court will not permit Broadway or any other witness to speculate about how undisclosed declarants ("everybody," for example) "knew" that Shaw believed that (1) Mink had reported Shaw in May 2005 and/or (2) Mink was the first to participate in Johnston's investigation. Finally, as to the testimony at Broadway Dep. 58:12-17, even Broadway admitted that she was "guessing" as to what she "would have told Mink;" moreover, as discussed with respect to Objection No. 2, the court will not permit trial witnesses to testify that they told Mink to "watch her performance" when Shaw returned to her supervisory role over Mink in March 2010.

- Objection No. 4: PHC's Objection to deposition testimony from Garver will be sustained in part and overruled in part. For several years, Garver worked with Shaw (his supervisor) and Mink (his subordinate), both during and after the May 2005 investigation of Shaw. Garver testified at some length about his impressions of Shaw, which are drawn from his personal interactions with her. Garver also testified that he had several conversations with Shaw in which Shaw stated that she blamed Mink for initiating the investigation. Having participated in those conversations, it is permissible for Garver to testify to his observations of Shaw's temperament and demeanor, namely that Shaw "wasn't happy about it" and

"seemed ticked" at Mink.  However, as with Broadway's impressions about the substance of her 2010 call with Shaw, defense counsel can cross-examine Garver to establish that he cannot actually know what Shaw intended.[2]  Given Garver's personal experience with Shaw, it is permissible for him to state his impression that she has a "nasty streak."  Also, although Garver can testify concerning his observations of Shaw's attitude towards Mink, Garver's testimony about the alleged belief of other employees that Shaw did not like Mink is inadmissible hearsay.

- Objection No. 5:  PHC's Objection to deposition testimony from Jamie Hynes will be overruled.  Hynes testified that he participated in "a lot of" training sessions with Mink and found her to be "a great trainer."  Hynes also testified that his own clients had reported positive reviews of Mink to him, and that several clients had continued to ask for her well after PHC had terminated her. Based on this proper foundation, the court finds that Hynes' impressions of how his clients appeared to view Mink ("they absolutely loved her") reflect permissible commonplace inferences he drew from personal observations of Hynes and his clients.

- Objection No. 6:  PHC's Objection to deposition testimony from Shaw will be overruled.  The testimony relates to whether a particular client was expecting Mink to appear for a previously scheduled training in February 2011.  Although the question posed by counsel may have asked for speculation, Shaw answered based on personal knowledge that she had asked Dana Kincaid (a trainer who handled scheduling) "to be careful about committing that we would have her [Mink] definitely be the one, because it was in this time frame I wasn't sure what was going to happen."  This testimony, which is based on Shaw's personal knowledge, is relevant to show that, even before Mink was terminated, Shaw already had told another trainer not to commit to scheduling Mink for a business trip.

- Objection No. 7:  PHC's Objection to testimony from Whetnight will be sustained in part and overruled in part.  The court will consider the referenced Whetnight testimony to the extent it relates to Whetnight's positive impression of Mink's work performance and her impression of clients' positive reaction to Mink's

---

[2]Indeed, even when pressed by Mink's counsel at deposition, Garver was careful to delineate the scope of his own knowledge and to limit his testimony only to his observations of Shaw's demeanor, without speculating as to why she might have exhibited a particular temperament.  (*See* Garver Dep. at 159:8-14 ("Q: Do you believe that she had a grudge against Ms. Mink for her belief that she reported her to HR?  A: You know, *I don't know if she had a grudge*, but I know that she wasn't – she wasn't happy about it.") (emphasis added and objection omitted).

training sessions.  However, because it lacks a proper foundation in the context of her deposition, Whetnight's testimony purporting to evaluate the truthfulness of allegations made by her peers will not be considered.

- <u>Objection No. 8</u>:  PHC's objection to the court's consideration of Paragraph 6 of the Swafford Affidavit will be overruled as moot.  Mink has clarified that she does not seek an adverse inference based on the fact that PHC was unable to locate Johnston's individualized notes concerning the *individual* interviews she conducted – as opposed to Johnston's master notes, which PHC did produce.[3] The court understands that Johnston left the company in 2008, well before the alleged acts of retaliation by Shaw in 2010 and 2011.

## III.    <u>Additional Factual Context</u>

As part of the May 2005 investigation, Johnston prepared a set of master notes, which reflected her observations, conclusions, and recommendations for Shaw.  In most relevant part, Johnston's master notes indicate that (1) "Tracy has been accused of making multiple comments and questions regarding the sexual orientation of other employees", and (2) all of the employees interviewed stated that they feared retaliation from Shaw.[4]  Although Shaw denies it, Garver has

---

[3]According to Johnston's testimony, Johnston took separate notes during each interview she conducted in May 2005 (the "individual notes"), each set of which would have identified the interviewee and the comments/complaints reported to Johnston by that particular interviewee.  Based on the individual notes, Johnston prepared a master set of notes ("master notes"), which, *inter alia*, aggregated and summarized the comments Johnston received from the interviewees.  Unlike the individual notes, the master notes did not attribute particular comments to particular interviewees.  PHC located and produced the master notes in this litigation, but PHC was not able to locate the individual notes.  Although it would ultimately have proven helpful to have the individual notes for purposes of this case, the record does not suggest that PHC's failure to locate the individual notes reflects spoliation or any other type of wrongdoing.

[4]Johnston's master notes contain a remarkable section entitled "Retaliation," which states as follows: "Each member of the group perceives that there is a rotating scapegoat role in the group.  This person is checked up on more frequently, questioned more harshly, called out in meetings, and is generally perceived to 'be in trouble.'  The designation of the person in this role changes over time.  Everyone has served a term at some point except Nick, but even Nick described the scapegoat phenomena, and everyone consistently identified who the scapegoat is right now.  There is fear in the group that speaking up to Tracy [Shaw] or expressing concern or issue [sic] will result in becoming the scapegoat.  It is this fear that led the trainers to seek help

testified that, following the investigation, Shaw told him at least three or four times that she blamed Mink for reporting her to Human Resources in May 2005. Garver also recalls that, in the context of these three or four conversations, Shaw "seemed ticked" at Mink and "was not happy about it."

Nevertheless, between 2005 and 2008, Shaw had the authority to downgrade Mink's (generally positive) performance reviews, but never did so. In 2007, Shaw also approved Mink's promotion to "National Trainer."

In March 2010, during the time frame in which she resumed her role as Mink's supervisor, Shaw called Broadway and, in Broadway's view, seemed to be looking for grounds to fire Mink. In March 2010, Shaw was also apparently tasked with delivering Mink's performance review, even though Shaw had not supervised Mink during the previous year. According to Mink, during the review Shaw falsely accused Mink of sleeping with a client.

PHC and Mink present fundamentally different accounts of Mink's conduct from March 2011 through her termination. On average, trainers traveled for about three weeks out of every four and spent the fourth week as a "home week" at their home office. During travel times, the trainers were expected to train clients in how to use PHC's software, whereas, on home weeks, the trainers were expected to prepare for subsequent training sessions and to handle certain internal administrative tasks. According to Mink, Shaw essentially made it difficult for Mink to handle "home week" tasks by forcing her to travel an excessive amount, even while Mink's father was suffering from terminal lung cancer. Shaw then exacerbated Mink's difficulties by

from outside the department, and this perception that contributes to one-way communications within the department." (Ex. 2 to Johnston Dep.)

heaping additional administrative tasks onto Mink's workload that were unnecessary, excessive, and/or carried with them unrealistic deadlines. Mink also contends that, unlike with other trainers, Shaw constantly reprimanded and/or reported her for trivial violations of company policies or Shaw's (arbitrary) project deadlines. For example, Mink recalls that Shaw reprimanded her for failing to submit certain training reports within a specified deadline but did not reprimand a different trainer, who also had several (eight) outstanding training reports. Mink believes that the September 2010 Corrective Action form essentially reflected much ado about nothing.

PHC presents a much different account. In 2009, PHC employed a new CEO, Scott Mackenzie, who implemented a "performance-driven" approach that held managers accountable for the performance of their subordinates. Under the new policy, managers were expected to continuously review the performance of their subordinates and to weed out any underperforming employees. PHC argues that Shaw cracked down on Mink's performance deficiencies as part of this paradigm shift at PHC and that Mink simply refused to adjust. Indeed, the record contains several email exchanges in which Mink failed to respond to Shaw with respect to certain projects and/or failed to meet required deadlines for administrative projects, violations that were eventually reflected in the September 2010 Corrective Action report. PHC also argues that, with respect to the six-month period in which Mink only had three home weeks (rather than six), Mink's extra work was attributable to the department's being short-staffed due to a worker's compensation injury, a termination, and a new hire. PHC also observes that, from March 2010 through her termination, Mink had several non-confrontational social interactions with Shaw, such as having drinks with Shaw and several other employees after a holiday party and attending

Shaw's 40th birthday party.  In a declaration, Shaw has also attached a host of friendly email communications between her and Mink through January 2011.

PHC also points out that a December 2010 training by Mink (and two others) with a key client went badly, leading PHC to lose business and causing, at the time, quite a stir within PHC. Shaw also wrote up Mink for failing to complete a "self-service portal" ("SSP") project, which was a project initiated by and important to Fox.  Shaw reported that Mink simply failed to work on the project at all.

With respect to the last two issues, which occurred shortly before her termination, Mink presents a much different picture.   Mink states that Shaw failed to adequately explain to Mink the nature and importance of the January 2011 mock training exercise, causing Mink unwittingly to underperform during that session.  Mink also contends that Shaw failed to explain the importance of the SSP project, failed to place any deadlines on Mink's portion of the project, and failed to give Mink adequate time to handle the project, given Mink's existing responsibilities. Furthermore, Mink avers that she actually did perform work on the project in a separate spreadsheet (different from the one Shaw had sent), but that Shaw refused to listen to Mink's explanation in this regard and falsely reported to Fox that Mink had failed to do any work on the project.

Fox made the ultimate decision to terminate Shaw.  He testified that the combination of violations documented and reported by Shaw (including the September 2010 Corrective Action write-up and subsequent reports from Shaw), the December 2011 dust-up with PHC's client, and his own observations of Mink during the January 2011 mock training exercise convinced him that terminating Shaw was appropriate.  According to Fox, Shaw initially defended Mink and

sought more time to work through Mink's purported performance deficiencies, but ultimately assented to Fox's conclusion that Mink should be terminated.

## SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2013). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325). "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).) The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "In evaluating the evidence, the court must draw all inferences in the light

most favorable to the nonmoving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587). But "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249. An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## II.    Retaliation Claim Under Title VII

### A.    Burden-Shifting Framework

Title VII forbids an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e3(a); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Title VII's anti-retaliation provision "seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms." *Burlington N. & Sante Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)).

A claim for retaliation under Title VII based on circumstantial evidence is governed by the *McDonnell Douglas* burden-shifting framework. Mink must first make out a *prima facie* case by showing that (1) she engaged in protected activity; (2) the employer knew of the exercise of the protected right; (3) an adverse employment action was subsequently taken against her; and

(4) there was a causal connection between the protected activity and the adverse employment action. *Imwalle*, 515 F.3d at 544. Once Mink establishes her *prima facie* burden, the burden shifts to PHC to produce a legitimate, non-discriminatory reason for Mink's discharge. *Id.*; *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004). If PHC satisfies this burden, Mink must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation for engaging in the protected activity. *Id.*

## A.    *Prima Facie* **Case**

PHC argues that Mink has not shown that she engaged in activity protected by Title VII with respect to the May 2005 investigation. Under Title VII, "protected activity" includes either (a) participation in any proceeding under Title VII (the "participation clause") or (b) opposition to a practice declared discriminatory under Title VII (the "opposition clause"). *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 581 (6th Cir. 2000); *Crawford v. Metro Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 275, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009). Here, Mink argues that she engaged in protected activity under the opposition clause.[5]

Under the opposition clause, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII. *Id.* at 579-80. Title VII does not define the term "oppose". Therefore, the Supreme Court has stated that the term carries its ordinary meaning, which is "to resist or antagonize . . . ; to contend against; to confront; to resist; to withstand." *Crawford*, 555 U.S. at 276 (ellipsis in original)

---

[5]In its initial brief, PHC argued that Mink has not shown that she engaged in activity under the "participation clause." Mink does not dispute PHC's argument.

(quoting Webster's New Int'l Dictionary (2d ed. 1958)). The term "opposition" includes "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer– *e.g.*, former employer, union, and co-workers." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008); *Johnson*, 215 F.3d at 579-80 (citing *EEOC Compliance Manual*, (CCH) ¶ 8806). However, "the only qualification that is placed upon an employee's invocation of protection under Title VII's opposition clause is that the manner of [the employee's] opposition must be reasonable." *Niswander*, 529 F.3d at 721 (quoting *Johnson*, 215 F.3d at 580). The Supreme Court has clarified that, "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication *virtually always constitutes the employee's opposition to the activity.*" *Id.* at 851 (emphasis added).

As an initial matter, PHC argues that Mink is precluded from pursuing a claim premised on the opposition clause because she failed to specify that she was proceeding under that type of theory in her EEOC Charge and in her Complaint in this case. In Mink's EEOC charge, which Mink appears to have submitted on her own behalf, Mink alleged discrimination based on "sex" and "retaliation." (*See* Compl., Ex. 1, June 15, 2011 EEOC Charge.) In her description of the event, Mink stated that Shaw had made "inappropriate sexual comments" to her. She also originally stated as follows: "However, when I reported Ms. Shaw behavior [sic] to Human Resource [sic], Human Resource [sic] conducted an investigation and Ms. Shaw was transferred to another position of Passport." Using a pen, Mink apparently struck through and amended the statement to read as follows: "Human Resources conducted an investigation *that I participated*

*in* that resulted in Ms. Shaw being transferred to another location of Passport." (*Id.* (emphasis added).) The court agrees with Mink's representation that, in making this change to her EEOC charge, she was simply seeking to correct her original statement. Indeed, the original statement incorrectly suggested that *Mink's* report to Human Resources caused the investigation, when in fact it was another employee's report (apparently Kellie Worley's) that precipitated the investigation. Under the circumstances, the court finds that Mink's EEOC charge sufficiently encompassed a retaliation claim premised on the opposition clause, notwithstanding her use of the word "participation." Similarly, Mink's Complaint alleged that Shaw "regularly" made inappropriate comments to her of a sexual nature, including "same sex advances." The Complaint also alleged that PHC "became aware of Shaw's unacceptable and sexually charged comments and interviewed the employees Shaw supervised," including Mink, who was the first employee interviewed. The court finds that, although they could have been more specific, these allegations were sufficient to put PHC on notice that Mink might claim that she engaged in protected activity under the opposition clause.

A more difficult question is whether, based on the evidence, Mink actually engaged in activity protected against retaliation by Title VII. As the Sixth Circuit has construed Title VII, "sexual orientation is not a prohibited basis for discriminatory acts." *Gilbert v. Country Music Ass'n, Inc.*, 432 F. App'x 516, 519 (6th Cir. 2011) (quoting *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006)). Thus, a claim premised on sexual orientation discrimination alone does not state a claim upon which relief may be granted. *Gilbert*, 432 F. App'x at 519. For example, Title VII does not protect an employee from harassing conduct where the charged conduct "is more properly viewed as harassment based on [the employee's] perceived

homosexuality, rather than based on gender non-conformity." *Gilbert* (quoting *Vickers*, 432 F. App'x at 519-20). *Vickers*, *Gilbert*, and cases applying them have dealt with the issue of heterosexuals discriminating against homosexuals or perceived homosexuals, where the aggrieved employee did not make any allegation that his or her workplace appearance and/or "gender non-conformity" played any role in the discrimination. *See, e.g., Gilbert*, 432 F. App'x at 519 (no protection for openly gay employee referred to as a "faggot," because, based on complaint, "[f]or all we know, Gilbert fits every male 'stereotype' save one – sexual orientation – and that does not suffice to obtain relief under Title VII"); *Vickers*, 453 F.3d at 759 (security guard harassed at work for being a "fag" and "gay" not protected by Title VII, where plaintiff did not allege "non-conforming behavior observed at work or affecting his job performance").

On the other hand, the Supreme Court and the Sixth Circuit have found that, under appropriate circumstances, Title VII forbids same-sex sexual harassment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998); *Wasek v. Arrow Energy Servs. Inc.*, 682 F.3d 463, 468 (6th Cir. 2012). As set forth in *Wasek*, a case that post-dates *Vickers* and *Gilbert*, "a trier of fact may infer that harassment occurred because of sex when the plaintiff can produce (1) 'credible evidence that the harasser was homosexual,' (2) evidence that 'make[s] clear that the harasser is motivated by general hostility to the presence of [the same sex] in the workplace,' or (3) 'comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.'" *Id.* (quoting *Oncale*, 523 U.S. at 79). This approach reflects the Supreme Court's finding in *Oncale* that an employee could maintain a Title VII sexual harassment claim by showing, for example, that a same-sex supervisor made unwanted sexual advances on the employee based on the employee's gender –

*i.e.*, because they were same sex. *Oncale*, 523 U.S. at 80-81 ("[T]he challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume that those proposals would not have been made to someone of the same sex. The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual.")

Furthermore, in *Wasek*, the Sixth Circuit outlined a crucial distinction: Title VII can protect a plaintiff from retaliation for reporting potential same-sex harassment, even though the conduct of which the plaintiff complained was not actually actionable harassment under the law. To obtain protection against retaliation under Title VII, a plaintiff simply must have had a "reasonable and good faith belief" that the harassing conduct she was reporting constituted a violation of Title VII. *Wasek*, 682 F.3d at 469. Thus, the operative question is whether an employee alleging same-sex harassment "could have had a reasonable, good faith belief that [s]he was being sexually harassed." *Id.*[6]

For example, in *Wasek*, an employee alleged that his male colleague often harassed him by simulating same-sex acts and making unwanted verbal sexual advances, and that his employer retaliated against him (the plaintiff) for complaining about this harassment. *Id.* at 465-467. Although the Sixth Circuit agreed with the district court that the plaintiff could not establish a same-sex *discrimination* claim under Title VII because he had failed to show that the harassing

---

[6]Notably, in *Vickers*, the appellant only addressed the viability of his Title VII discrimination claim on appeal, but did not address the viability of his Title VII retaliation claim. 453 F.3d at 761 n.1. Thus, the Sixth Circuit found that the appellant had waived the right to challenge dismissal of the retaliation claim and, therefore, the court did not address the potential merits of that argument on appeal.

supervisor was homosexual,[7] the Sixth Circuit held that the plaintiff nevertheless had engaged in protected activity for purposes of his *retaliation* claim. The court found that (1) it was not an "unreasonable mistake of law" for Wasek to believe that the supervisor's same-sex harassment might have constituted actionable harassment under Title VII; and (2) Wasek had a reasonable, good faith belief that the supervisor's conduct amounted to sexual harassment, given that Wasek had suffered unwanted sexual touching and communications in the workplace on multiple occasions. *Id.* at 469-70. Thus, the court concluded that "it was reasonable for Wasek to believe that he was the victim of sexual harassment, even if that belief was ultimately at odds with the law. Thus, Wasek's complaints about sexual harassment were protected activity." *Id.*[8]

Here, although it is a close question, the court finds that there is sufficient evidence from which a rational factfinder could conclude that Mink believed that Shaw's conduct amounted to actionable same-sex sexual harassment under Title VII. Shaw was openly homosexual at the time of the investigation. According to Mink, to that point, Shaw had engaged in repeated instances of same-sex harassment by making sexually charged and/or suggestive comments to Mink, such as suggesting that Mink should "switch sides," that Mink would make a good "lipstick lesbian," and that Shaw knew "ladies who would like you." Shaw suggested that Mink should abandon her boyfriend and join the lesbian "team." These comments arguably were

---

[7]The court found that, of the three methods of showing unlawful same-sex sexual harassment outlined in *Oncale*, only the first – proceeding under the theory that a same-sex supervisor was homosexual – was available to the plaintiff under the factual circumstances presented. *Id.* at 467-68. The court found that the record did not establish that the supervisor was homosexual. *Id.* at 468.

[8]Although the court found that Wasek's complaints constituted protected activity, it nevertheless affirmed the district court's dismissal of Wasek's retaliation claim for failure to establish the requisite causal connection. *Wasek*, 682 F.3d at 471-72.

premised on Mink's gender as a female and either implicitly or explicitly suggested that Mink should engage in sexual activity with Shaw's female friends, if not Shaw. Mink told Shaw to stop multiple times, but Shaw persisted. Having been (allegedly) subjected to this harassing conduct, including unwanted suggestions of sexual activity premised on Mink's gender as a female, there is at least a question of fact as to whether Mink held a reasonable, good faith belief that she was being sexually harassed, notwithstanding the fact that this belief ultimately may have been wrong under the law. *See Wasek*, 682 F.3d at 470. Thus, although PHC argues that Mink could not have maintained a Title VII discrimination claim against PHC – indeed, Mink never brought suit to allege discrimination – Mink may still have been protected against retaliation by Title VII.

As to what Mink actually reported to Johnston, the court finds that Mink's failure to recall specific details at deposition does not require dismissal of her claim. The alleged retaliatory actions took place approximately five years after the May 2005 investigation, and Mink was deposed nearly seven years after her discussion with Johnston, so it is understandable that Mink cannot recall verbatim what she told Johnston. Johnston cannot recall what each interviewee specifically told her, and Johnston's individual notes, which likely would have attributed particular complaints to specific interviewees, no longer exist (or at least cannot be located).[9] The best available evidence is Mink's own testimony, which establishes that she told Johnston "all about the gay issues" and about "all the uncomfortable things that Shaw was doing." Taken in context, a rational factfinder could infer that Mink's comments concerning

---

[9]Again, although the record contains Johnston's aggregated master notes, it does not contain Johnston's individual notes from each interview. The individual notes from Mink's interview may have reflected the specific comments that Mink made to Johnston.

these issues included complaining about Shaw's same-sex harassment of Mink. Thus, although it is a close question, the court finds that it will be for the jury to determine whether Mink opposed Shaw's (alleged) same-sex harassment during her interview with Johnston.

With respect to Shaw, the evidence indicates that Johnston told Shaw to cease making comments related to sexual orientation and that Johnston told Shaw to cease discussing sexual issues with her employees. The evidence also indicates that Shaw blamed Mink for initiating the investigation. Thus, a rational factfinder could infer from those facts that Shaw believed Mink had complained about Shaw's comments to Mink in a way that portrayed Shaw as harassing her. Accordingly, the court finds that there is a genuine dispute of material fact as to whether Mink engaged in protected activity.

With respect to the causation element, "[t]he burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). "Temporal proximity always plays a role in establishing a causal connection; its significance depends on the context." *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013). "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). Ultimately, courts must "look[] at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010).

In *Fuhr*, the plaintiff, Fuhr, was a high school basketball women's basketball coach. *Id.* at 670. In 1999, Fuhr sued her high school for refusing to hire her as the men's varsity basketball coach (she apparently sought to coach both teams at the same time), leading to a 2001 court order requiring the school to hire her for that position. *Id.* at 670-71. In 2004, the Sixth Circuit affirmed that order. *Id.* at 671. In 2006, the school fired Fuhr as the *women's* basketball coach, at which point Fuhr sued the school again, claiming that the school was retaliating against her for pursuing the initial lawsuit with the respect to the men's basketball coach position. *Id.* at 671-72. The Sixth Circuit held that Fuhr could not establish the causation element of her *prima facie* case. *Id.* at 676. The court stated that the shortest possible time between protected activity and the adverse action was the two-year period between the Sixth Circuit order affirming Fuhr's original case and the school's 2006 decision to terminate her. *Id.* at 675. The court found that "this multi-year gap proves fatal to Fuhr's assertion that there is a causal connection." *Id.* at 675-76. The court observed that "multiyear gaps between the protected conduct and the first retaliatory act have been insufficient to establish the requisite causal connection." *Id.* at 676. The court stated that "a lack of temporal proximity alone *can be* fatal to an attempt to establish a causal connection *under circumstances such as these*." *Id.* (emphases added).[10]

Here, nearly five years elapsed between Mink's alleged protected activity in May 2005 and the alleged retaliatory actions by Shaw, which began in approximately March 2010. PHC argues that, in light of *Fuhr*, the court must find that Mink cannot establish the requisite causal connection. However, the court does not construe *Fuhr* as asserting that a two-year gap or more requires dismissing a retaliation claim. Indeed, the *Fuhr* court was careful to state that a lack of

---

[10]The court in *Fuhr* did not articulate what the relevant "circumstances" were.

temporal proximity "can be" fatal to a retaliation claim, thereby implicitly acknowledging that a lack of temporal proximity is not *necessarily* fatal to such a claim. This interpretation is consistent with longstanding Sixth Circuit precedent indicating that the causation analysis reflects a court's assessment of the totality of the circumstances, rather than a bright line rule. Here, the record does contain evidence suggesting that, even five years later, Shaw sought to retaliate against Mink for complaining about Shaw to Human Resources in 2005. Mink has explained that Shaw may have refrained from retaliating against her until (1) Johnston left the company and (2) Shaw was back in a position to retaliate against Mink as her direct supervisor. Standing alone, this theory might be insufficient to bridge the temporal gap. However, Broadway has testified that Shaw called her in February or March 2010 – either just before or just after Shaw resumed supervising Mink – searching for reasons to justify firing Mink. Assuming Broadway's impression to be correct, the record contains no obvious explanation as to why Shaw would have sought to terminate Mink immediately upon becoming her supervisor. Indeed, Broadway found it odd that Shaw would seek reasons to fire Mink, given that, to Broadway's understanding, PHC's Training Department was already short-staffed. Based on this evidence, and in light of the fact that Shaw's former subordinates have portrayed her as a backbiting and mercurial supervisor, a rational factfinder could conclude Mink still harbored a grudge against Mink in 2010, notwithstanding the passage of time.

Accordingly, under the totality of the circumstances, the court finds that this is an exceptional case in which the five-year gap between the protected activity and the alleged retaliatory actions is not dispositive of Mink's retaliation claim. Therefore, under the circumstances, the court finds that Mink has established the requisite causal connection.

**B.      Non-Discriminatory Motive and Pretext**

PHC argues that it terminated Mink for performance deficiencies.  PHC has provided

evidence supporting this basis for termination, including the September 2010 Corrective Action

form, various email exchanges, and testimony from Shaw and Fox, among other sources of

information.  Therefore, PHC has met its burden to produce a legitimate, non-discriminatory

justification for Mink's termination, and the burden shifts to Mink to show pretext.

Mink can demonstrate pretext by showing that PHC's proffered reason (1) has no basis in

fact; (2) did not actually motivate PHC's challenged conduct; or (3) was insufficient to warrant

the challenged conduct.  *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th

Cir. 1994).  "Regardless of which rebuttal method is employed, the plaintiff retains the ultimate

burden of producing sufficient evidence from which the jury could reasonably reject [the

defendant's] explanation and infer that the defendant [] intentionally discriminated against

[her]."  *Imwalle*, 515 F.3d at 545 (quoting *Johnson v. Kroger*, 389 F.3d 858, 866 (6th Cir.

2003)); *Manzer*, 29 F.3d at 1083 ("The jury may not reject the employer's explanation, unless

there is a sufficient basis in the evidence for doing so.")  Ultimately, Mink must show that an

unlawful retaliatory motive was the "but for" cause of her termination.  *Univ. of Tex. Sw. Med.

Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).  In other words, to prove retaliation, Mink must

prove that "the unlawful retaliation would not have occurred in the absence of the alleged

wrongful action or actions of the employer."  *Id.*

There is no evidence in the record showing that Fox (Shaw's supervisor) or any

decisionmaker at PHC other than Shaw was aware of Shaw's potential retaliatory motive.

However, if Mink can show a "causal nexus" between Fox's decision to terminate her and

Shaw's unlawful retaliatory animus, PHC could still be liable for retaliation under a "cat's paw" or "rubber stamp" theory of liability. *See Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 836 (6th Cir. 2012); *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008) (finding that cat's paw theory of liability provided a sufficient basis to justify a finding of pretext in Title VII discrimination case). Drawing all reasonable inferences in favor of Mink, a rational factfinder could conclude that many, if not all, of the performance deficiencies that Mink experienced were caused by Shaw's efforts to undermine her and/or reflected attempts by Shaw to report Mink for trivial violations. A rational factfinder could also conclude that Fox relied substantially on information about Mink provided to him by Shaw in determining that Mink should be terminated. Therefore, if Shaw in fact sabotaged Mink's ability to perform her job and/or purposely wrote her up for trivial or non-existent violations, a rational factfinder could conclude that (a) Fox terminated Mink because of deficiencies caused by Shaw, and (b) Mink would not have been fired if Shaw had not retaliated against her.

With respect to whether Shaw's grounds for writing up and reporting Mink for performance deficiencies were justified, the parties have presented factually inconsistent accounts of what transpired between March 2010 and January 2011. Mink's version is that Shaw piled work on her, forced her to travel more than her co-workers and yet expected her to complete "home week" assignments, made false accusations about her, misrepresented the nature of the mock training presentation (leading Mink to believe that it was essentially going to be a collaborative exercise rather than a start-to-finish mock training), and falsely reported that Mink had failed to work on and complete the SSP project for which Shaw had provided no deadline. Testimony from several disinterested witnesses corroborates Mink's belief that she was a well-

regarded employee internally and that she maintained a good relationship with PHC's clients. Mink argues that this evidence shows that Shaw's criticisms were unjustified. Mink also argues that, in light of the fact that PHC's clients generally had a highly favorable impression of her, it was ridiculous for Shaw to write up and report Mink for violating internal administrative tasks and/or arbitrary deadlines set by Shaw with respect thereto. Furthermore, as Mink points out, her final write-up did not even reference the December 2010 client incident and the January 2011 mock training exercise, suggesting that PHC may now be engaging in a *post hoc* rationalization of its decision to terminate Mink.

On the other hand, the evidence shows that Shaw had several opportunities to retaliate against Mink between May 2005 and March 2010, but never did so. Indeed, Shaw approved Mink's promotion to National Trainer. This evidence suggests that Shaw did not harbor a retaliatory motive in the first place. The evidence also contains documentation and testimony that Mink missed certain deadlines, may have violated certain company policies (such as the expense reimbursement policy), performed badly during the mock training session, and in part damaged a relationship with one of PHC's clients. Furthermore, testimony from Fox and Shaw suggests that Shaw may actually have attempted to prevent or at least forestall Mink's termination in January 2011.

Ultimately, with respect to pretext, a jury will need to sort out these vigorously disputed issues. In particular, it will be for the jury to decide whether Shaw (a) patiently cunningly waited for the right time to strike against Mink (*i.e.*, when substantially all of the principals involved in the 2005 investigation had left the company), or (b) simply applied more stringent company policies with which Mink consistently failed to comply. Although it may be difficult

for Mink to establish that she would not have been fired but for Shaw's retaliatory actions, the court finds that there is a genuine dispute of material fact with respect to pretext.

In sum, the court will deny PHC's Motion for Summary Judgment. In so doing, the court reiterates that this is a very close case on multiple fronts and that, for Mink to prevail at trial, Mink was will need to clear a number of factual hurdles. At a minimum, she will need to convince the jury that she opposed same-sex sexual harassment by Shaw in May 2005, that Shaw was actually aware that Mink complained about that alleged harassment, that Shaw, five years later, still held a grudge and sought to retaliate against Mink, and that Mink would not have been fired but for the consequences of Shaw's allegedly unlawful conduct.

## CONCLUSIONS

For the reasons set forth herein, PHC's Objections will be sustained in part and overruled in part, and PHC's Motion for Summary Judgment will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge